### 20232. DUNN *v.* THE STATE.

Decided February 13, 1930. Rehearing denied March 1, 1930.

*Branch & Howard, E. L. Tiller,* for plaintiff in error.

·*Claude C. Smith, solicitor-general,* contra.

Luke, J. The indictment charges Charlie Dunn and John B. Kemp with murdering Joe Hardison by beating him with a rock and cutting him with a knife. Dunn was tried separately and convicted of voluntary manslaughter. His exception here is to the judgment overruling his motion for a new trial, based upon the usual general grounds and three special grounds. The controlling question is whether or not voluntary manslaughter is involved in the case.

Joe Hardison was killed between 7:30 and 9 o'clock at night on a street in Stone Mountain, Ga. He was struck with a rock in the face and cut with a knife in the heart at the same time, and died almost immediately from the wound in the heart.

It appears from the testimony of defendant's witnesses that at about 7:30 o'clock on the night of the killing, Joe Hardison saw another negro named Dorris Smith talking to his (Joe's)· wife and another woman, and Joe cursed Smith and cut him in the arm, and that Smith ran, pursued by Hardison, but that Smith outdistanced his pursuer and got away. It further appears from defendant's witnesses that when a negro named Emmett Hines saw Smith running and asked his companion who it was, Hardison heard him, seized him roughly by the arm, "drew back at him," and ordered him to get out of the way. It also appears that Joe Hardison and his wife had separated. Dorris Smith testified that he "did not see Charlie Dunn or John Kemp, or any of those boys" between the time he was cut and the time Hardison was killed, and that he did not have anything to do with the killing. Emmett Hines swore that he did not see the defendant that night, and that he was at home when the killing occurred.

Two witnesses testified that the defendant confessed that he stabbed Hardison, and that John Kemp stated in defendant's presence that he, Kemp, hit Hardison with a rock. In this connection, O. R. Rowell, a policeman sworn for the State, testified as

follows: "They did not say that they just walked up and hit that negro in the head for nothing. They said something about him having struck at one of the boys with a knife and cut him; and some one said, 'What did you do that for?' and then the negro came on them, something to that effect."

The State's case may be summarized as follows: Several negroes came down the road. . Defendant was with the crowd and had a knife. One of the party cursed the deceased vilely and threatened to kill him. The deceased was struck with a rock and cut at the same time, and while he was begging to be let alone. The witness Katherine Chambers vividly described the occurrence in this language: "He [Hardison] did not make any threats against any of those men. He was just begging them not to harm him, and he had an awful look on his face, just like a child fixing to get a whipping." A physician testified that deceased had a bruise on the side of his face, and a knife wound an inch and a half deep in his heart, and that, in his opinion, the wound in the heart caused his death. There was evidence for the defendant that a knife with a long blade was found on the body of the dead man, and that the knife was a deadly weapon.

The defendant made the following statement to the jury: "Me and Leon Bennifield and Ed Banks left from his house, coming to town after some cigarettes, . . and we come back and met Johnnie B. We turned around and come on back, coming down the road. Johnnie Seaborn was standing out in front of his house. Johnnie B. was talking to him, and Ed Banks and Leon was standing out in the road waiting for him and this fellow to come out of Seaborn's house—Joe Hardison. And we were waiting in the road, and this fellow says: 'Who in the hell is you?' And I stepped back, and he came on me with that knife, and when I seen he was coming on me I run back and picked up two rocks and hit him with one. After I hit him I run. That is all. . . ."

It is contended in the first special ground of the motion for a new trial that the court erred in charging the law of voluntary manslaughter, for the reason that there was nothing in the evidence or the defendant's statement to warrant the charge. "While in a murder case the court should not give the law of voluntary manslaughter in charge to the jury if there be *no* evidence, nor

anything in the defendant's statement at the trial, to authorize a consideration of that grade of homicide, yet if there be *any evidence to create a doubt, however slight*, as to whether the offense is murder or voluntary manslaughter, instructions as to the law of both of these offenses should be given. *Jackson* v. *State*, 76 *Ga.* 473, 478; *Wynne* v. *State*, 56 *Ga.* 113; *Griffin* v. *State*, 18 *Ga. App.* 462 (5) (89 S. E. 537)." See also *Lamar* v. *State*, 33 *Ga. App.* 605, 606, and the cases cited. Applying the foregoing rule of law to the record in this case, the court did not err in charging the law of voluntary manslaughter.

The first special exception also complains that after charging the law applicable to voluntary manslaughter as laid down in the Penal Code (1910), § 65, the court charged as follows: "While words, menaces, and contemptuous gestures shall in no case be sufficient to reduce the homicide below the grade of murder, when the killing is done not because of or on account of fear in the mind of the slayer, but solely for the purpose of resenting the provocation given. But I charge you that threats, accompanied by menaces, though the latter do not amount to an actual assault, may in some instances be sufficient to arouse the fears of a reasonable man that his life was in danger, or that a felony was about to be perpetrated upon him." "In all cases the motive with which the slayer acted is for determination by the jury; and if it be claimed the homicide was committed, not in a spirit of revenge, but under circumstances such as a reasonable man might infer that his life was in danger, then it is for the jury to decide whether the circumstances were sufficient to justify the existence of such fears."

It is contended that the first sentence of the charge quoted "is unintelligible and confusing, and states no principle of law." We do not think that the fact that the clause is not perfectly framed makes it unintelligible or confusing. The principle enunciated is certainly not subject to the criticism that it is not the law. It is substantially in the words of *Cumming* v. *State*, 99 *Ga.* 662 (2) (27 S. E. 177). Moreover, see *Deal* v. *State*, 145 *Ga.* 33 (88 S. E. 573).

It is further contended that this charge injected the doctrine of reasonable fears into the law of manslaughter, and necessarily led the jury to believe that the defendant could be convicted of

voluntary manslaughter even though he acted under the fears of a reasonable man that a felony was about to be committed upon him.

The charge is practically in the language of the *Cumming* case, supra. It is not perfectly phrased, but it did tell the jury that the broad statement in the Penal Code, § 65, that "provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder," does not change or limit the rule that the fears of a reasonable man that a felony is about to be committed upon him may justify the homicide. The court subsequently instructed the jury fully and correctly upon the law of voluntary manslaughter, and, in our opinion, the criticism of the charge is not valid.

The last insistence is that the court erred in not charging the law of involuntary manslaughter. That grade of homicide is not in the case, and the court properly omitted a charge upon it.

For no reason assigned did the court commit error, and the judgment overruling the motion for a new trial as amended is sustained.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*