23422. BIRD v. THE STATE.

DECIDED APRIL 6, 1934.

R. W. Martin, M. U. Mooty, for plaintiff in error.

W. Y. Atkinson, solicitor-general, Smith & Millican, contra.

MACINTYRE, J. George Bird and Mrs. Abbie Wilson were jointly indicted for the murder of Fred Brewer by shooting him with a shotgun on November 18, 1932, in Heard county. Having been tried separately and convicted of voluntary manslaughter, George Bird excepted to the refusal of a new trial. The record presents two questions for determination: (1) Does the evidence support the verdict? (2) Was the court warranted in charging the jury on the theory of voluntary manslaughter?

The homicide occurred on the afternoon of November 18, in Heard county, Georgia. Fred Brewer, the deceased, and his brother Goss Brewer, both of whom appeared to be under the influence of whisky, engaged in a personal difficulty, and Goss, with his brother in pursuit, ran to the house of Luke Bird, the defendant's son. Fred knocked violently on the door, and Luke Bird's wife ran away with her little children. It also appears that shortly before he was killed, Fred Brewer cursed and threw rocks at Mrs. Abbie Wilson's son, who had gone to the defendant's son's home on an errand for his mother. Mrs. Wilson and the defendant both appeared at Luke Bird's house shortly before the homicide.

S. Y. Miller, sheriff of Heard county, testified, in part: "He said the man started towards him, and Mrs. Wilson told him to shoot him, and he shot him in his yard. I asked him if the fellow had anything to hurt him with. He said, nothing that he knew of. I asked him if he could have gotten out of it without shooting him, and he said he could have run. . . He said he shot him because she told him to shoot him. He said he was in the back yard at the time of the shooting. . . He shot him in

the breast, . . as well as I remember, just a little bit to the left of the center. Looked like the shotgun was right close to him." Mrs. Wilson testified that she sent her son to the defendant's house to get some pigs, and that when she heard some screaming she came to see what was the matter. She testified also that the defendant backed away from the deceased as the latter was advancing on him to get the gun, and that she told the defendant not to let the deceased get to him.

The pertinent part of the defendant's statement to the jury is as follows: "I kept coming on until I got to my son's house. I . . got down and went in the house and called my daughter-in-law, . . and nobody didn't answer. I went on in the door that this man had burst open, the front door. . . There was nobody in there. I come on out to the well, and the thought struck me to take the gun out of this house and put it on my wagon and take it on up home, in case those men came back there again and got hold of the gun. . . I looked out and there was Mrs. Wilson and a strange white man facing myself in front of my son's house. . . Mrs. Wilson . . says: 'Run, he will shoot you.' I was going from them all the time. And the minute she said that, this man stepped between me and her, going towards me with his right hand in his pocket, and, being a strange white man, . . got me real nervous and afraid of him; and I decided to run, and he was rushing on me . . and mumbling something. . . Mrs. Wilson said he was cursing me, and said: 'Bobee, don't let him get to you; shoot him.' I hadn't been thinking of doing nothing like that. It wasn't my desire—didn't mean to do just what I did do; but a man was coming on me with his hands in his pocket, and I had run off from him, and she says: 'Don't let him get to you, shoot him.' This was a strange man, and I asked him to please go back. I said it three times—'Please go back.' He decided he was close enough to outrun me, I reckon, . . outrun me and take the gun. This man was running on me, and me running backwards, with something in his hand. I decided it was a bad butcher-knife, and I decided I would just give up and let him have me; and Mrs. Wilson spoke again: 'Shoot him, don't let him get to you.'"

It is inferable from the defendant's statement that he knew of the deceased's condition and conduct prior to the homicide. The defendant's statement to the jury injects into the case the theory

of "justifiable homicide." However, the jury has the right to believe such part of the statement as they see fit, and to construe it along with the evidence in the case. Did not the jury have the right to conclude that the defendant was exasperated when he found that his son's house had been broken into, and that his daughter-in-law and her babies had fled at a time when his son was absent from home at work, and that he got the gun for his own use rather than to keep the defendant from returning and getting it; and that when the very man who had perpetrated the outrages referred to advanced upon the defendant, cursing, and with what appeared to be a weapon in his hand, the defendant became so enraged that he fired the fatal shot? Again, was it not the province of the jury to determine, if they could, what sort of a weapon, if any, the deceased had when he was advancing upon the defendant? See *Chestnut* v. *State,* 112 *Ga.* 366 (37 S. E. 384) ; *Ellis* v. *State,* 30 *Ga. App.* 154 (117 S. E. 116). "Upon a trial for murder, where there is adduced any evidence sufficient to raise a doubt, however slight, as to whether the case is murder or voluntary manslaughter, the court should instruct the jury upon the law of voluntary manslaughter, as well as upon the law of murder." *Nichols* v. *State,* 35 *Ga. App.* 399 (133 S. E. 266). See also *Jackson* v. *State,* 76 *Ga.* 473; *Dunn* v. *State,* 41 *Ga. App.* 248, 250 (152 S. E. 637) ; *Reeves* v. *State,* 22 *Ga. App.* 628 (97 S. E. 115). The *Reeves* case states the rule to be: "The law of voluntary manslaughter may properly be given in charge to the jury on the trial of one indicted for murder, where, from the evidence or from the defendant's statement at the trial, there is anything deducible which would tend to show that he was guilty of voluntary manslaughter, or which would be sufficient to raise a doubt as to which of these grades of homicide was committed." Applying the rule last stated to the facts of this case as they appear from the evidence and the defendant's statement to the jury, we hold that the trial judge was authorized to charge the law of voluntary manslaughter. We hold also that the evidence supports the verdict, and that the court did not err in overruling the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*